# United States Court of Appeals
## For the First Circuit

Nos. 15-2436, 16-1077

MARK B. GALVIN; JENNY G. GALVIN,

Plaintiffs, Appellants,

v.

U.S. BANK, N.A., as Trustee Relating to Chevy Chase Funding, LLC
Mortgage Back Certificates Series 2007-1; MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.; CAPITAL ONE, N.A., a/k/a CAPITAL ONE
BANK, f/k/a CHEVY CHASE BANK, FSB,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Thompson and Kayatta, Circuit Judges,
and Barbadoro,* District Judge.

James T. Ranney for appellants.
Kevin P. Polansky, with whom Christine M. Kingston and Nelson
Mullins Riley Scarborough LLP were on brief, for appellees.

March 29, 2017

---

* Of the District of New Hampshire, sitting by designation.

**KAYATTA**, <u>Circuit Judge</u>.   This appeal arises out of a suit by defaulting borrowers who seek to assign fault to the manner in which a creditor foreclosed on its collateral, in this instance a multi-million dollar home located on Martha's Vineyard.  For the following reasons, we reject the borrowers' fusillade of challenges to the creditor's conduct, except that we find that the creditor waived its rights to a deficiency judgment by failing to comply with a Massachusetts statute that regulates the availability of actions for such judgments.

## I.   Background

We summarize the uncontested facts, reserving further discussion of the facts alleged in the complaint for the section on the motion to dismiss and further discussion of the evidentiary facts in the summary judgment record for the section on the motion for summary judgment.

On November 15, 2006, the plaintiffs, Mark and Jenny Galvin, took out a loan to buy a property in Tisbury, Massachusetts, and executed a mortgage naming the Mortgage Electronic Registration Systems, Inc. ("MERS") as the mortgagee "acting solely as a nominee for [Chevy Chase Bank, FSB] and [its] successors and assigns."  On the same day, Mark Galvin executed a promissory note in the amount of $2,385,000 to Chevy Chase Bank, FSB (now known as Capital One, N.A.--for our purposes, "Capital One").  In late 2009, the Galvins fell behind on their mortgage

payments. On March 2, 2011, their loan servicer, Specialized Loan Servicing ("SLS"), sent them a "Notice of Default and Notice of Intent to Foreclose."

At some point prior to August 3, 2012, U.S. Bank as Trustee Relating to Chevy Chase Funding, LLC Mortgage Back Certificates Series 2007-1 ("U.S. Bank") came into physical possession of the note, which was indorsed from "Chevy Chase Bank, F.S.B." to "U.S. Bank, N.A. as Trustee."[1] In July 2012, MERS assigned the mortgage to U.S. Bank. On October 2, 2012, this assignment was recorded in the town land records.

From December 2011 to November 2014, employees of a company hired by SLS[2] entered onto the Galvins' property roughly once per month to perform inspections. In February 2012 and November 2012, these individuals entered the house to inspect and winterize it. During the November 2012 interior inspection, they also changed the lock on the rear door. On September 7, 2012, the Galvins sent SLS a letter demanding that no one trespass on their

---

[1] The Galvins' complaint alleges that "U.S. Bank does not, and never has had, have [sic] physical possession of the original note," and that "[t]he location of the original note is unknown and it is denied that any party lawfully acting on behalf of U.S. Bank currently holds the note on U.S. Bank's behalf in compliance with applicable law." The Galvins abandoned this contention at oral argument.

[2] U.S. Bank does not dispute on appeal that SLS acted as its agent, or that the entries of the company hired by SLS to perform inspections can be attributed both to SLS and to U.S. Bank.

property. On April 17, 2013, the Galvins sent a thirty-day demand letter to U.S. Bank regarding these "unreasonable" inspections and any related fees, pursuant to Chapter 93A of the Massachusetts General Laws.

U.S. Bank conducted a foreclosure sale of the property on November 18, 2014, four days after the Galvins filed their complaint in this action. U.S. Bank itself was the purchaser.

The Galvins' complaint contained six counts relevant to this appeal: a claim against all defendants[3] for a declaratory judgment that the foreclosure was invalid (count I); a claim against U.S. Bank and MERS for breach of contract (count II); a claim against U.S. Bank and MERS for breach of the implied covenant of good faith and fair dealing (count III); a claim against U.S. Bank for trespass (count IV); a claim against U.S. Bank for a Chapter 93A violation (count VI); and a claim against all defendants for intentional and/or negligent infliction of emotional distress (count VII). U.S. Bank filed an answer and asserted counterclaims for deficiency, unjust enrichment, and possession.

The district court disposed of the Galvins' complaint in three separate rulings. In the first ruling, the district court

---

[3] U.S. Bank, N.A., as trustee relating to Chevy Chase Funding, LLC Mortgage Back Certificates Series 2007-1, MERS, and Capital One.

- 4 -

granted the defendants' partial motion to dismiss several counts under Federal Rule of Civil Procedure 12(b)(6). In the second ruling, it granted summary judgment to U.S. Bank on its counterclaim for possession. The district court entered a separate judgment (the "first judgment") on this counterclaim for possession pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. In the third ruling, the district court granted summary judgment to the defendants on the Galvins' remaining claims and to U.S. Bank on its counterclaim for deficiency (the "second judgment").[4] Between the ruling on the partial motion to dismiss and the ruling on the counterclaim for possession, the district court granted in part U.S. Bank's motion for a preliminary injunction and "enjoin[ed] and prevent[ed] the short term occupancies" of fourteen parties who had entered into leases with the Galvins to occupy their home during the summer of 2015.

## II. Discussion

We review the motion to dismiss and motion for summary judgment rulings de novo, see Gorski v. N.H. Dep't of Corrs., 290 F.3d 466, 471 (1st Cir. 2002), and the grant of the preliminary injunction for abuse of discretion, see Waldron v. George Weston Bakeries Inc., 570 F.3d 5, 8 (1st Cir. 2009). The parties agree

---

[4] The Galvins filed notices of appeal as to both the first and second judgments. Those appeals have been consolidated in this court.

that we apply Massachusetts substantive law.  See Wilson v. HSBC Mortg. Servs., Inc., 744 F.3d 1, 7 (1st Cir. 2014).

## A.    Appellate Jurisdiction

Although neither party raised this issue, "we have an independent obligation to confirm our jurisdiction to hear this dispute."  Me. Med. Ctr. v. Burwell, 841 F.3d 10, 15 (1st Cir. 2016).  The district court had jurisdiction over this case under 28 U.S.C. § 1332 based on diversity of citizenship.  The only arguable basis for our jurisdiction over these appeals is 28 U.S.C. § 1291, which grants this court "jurisdiction of appeals from all final decisions of the district courts."  See also Guillemard-Ginorio v. Contreras-Gómez, 490 F.3d 31, 37 n.4 (1st Cir. 2007) (noting that "[i]n the ordinary course, our jurisdiction extends only to appeals from 'final decisions of the district courts' (quoting 28 U.S.C. § 1291)).  Thus, we must determine whether the second judgment entered by the district court was a "final decision."[5]  When dealing with a "garden-variety" civil judgment like this one, "a final decision is one 'that disposes of all claims against all parties.'"  Me. Med. Ctr., 841 F.3d at 15 (quoting Bos. Prop. Exch. Transfer Co. v. Iantosca, 720 F.3d 1, 6

---

[5] The first judgment (the separate judgment on U.S. Bank's counterclaim for possession) was indisputably a final judgment, as it was entered under Rule 54(b).  See Spiegel v. Trs. of Tufts Coll., 843 F.2d 38, 42 (1st Cir. 1988) ("[Rule] 54(b) permits the entry of judgment, and thus an appeal, on fewer than all the claims in a multi-claim action.").

- 6 -

(1st Cir. 2013)). There are three defendants in this action: U.S. Bank, MERS, and Capital One. We pause to consider whether the second judgment was a final decision as to Capital One.

The record is somewhat ambiguous on this point. All three defendants were named in the original complaint filed in state court. In the notice of removal, U.S. Bank and MERS noted that Capital One had not provided consent to removal because, as far as the state court docket showed, the plaintiffs had not served it with process. After the case was removed to federal court, Capital One never filed an appearance. The district court noted this fact in its ruling on the partial motion to dismiss. Following that ruling, the parties filed a "Joint Statement" pursuant to Local Rule 16.1(d), in which they stated that "according to the Court's docket, it does not appear that Defendant Capital One, N.A., a/k/a Capital One Bank, f/k/a Chevy Chase Bank, FSB ('Capital One') has yet been served with the complaint." The district court subsequently ordered that "Amended Pleadings & Joinder of Parties" would be "due by 5/15/2015," but that date passed without action or comment.

Two counts in the complaint named Capital One as a defendant: the declaratory judgment count (count I) and the intentional infliction of emotional distress count (count VII). The district court disposed of these counts at different times. It dismissed the declaratory judgment count in its entirety when

ruling on the partial motion to dismiss. It dismissed the intentional infliction of emotional distress count as to MERS only in the same ruling. The district court later allowed U.S. Bank's motion for summary judgment as to the intentional infliction of emotional distress count and instructed the clerk of court to "close the case."

We conclude that the court disposed of both claims against Capital One. The ruling dismissing the declaratory judgment count was not limited to the two defendants who had appeared. The ruling on U.S. Bank's motion for summary judgment is a closer question. However, in granting that motion and ordering the clerk to close the case, the district court effectively granted summary judgment to Capital One on the intentional infliction of emotional distress claim against it. Between that ruling and the ruling on the partial motion to dismiss, the district court held that the factual basis for the intentional infliction of emotional distress claim against Capital One was insufficient as a matter of law.[6] Neither party contended otherwise in the district court or on appeal. The district court's order and its instruction to the clerk to close the case therefore constituted a final decision. See Mohawk Indus., Inc. v.

---

[6] We express no opinion as to whether the district court had personal jurisdiction over Capital One. See Fed. R. Civ. P. 4(c)(1), (e)(1)-(2); Mass. R. Civ. P. 4(d)-(e); Echevarria-Gonzalez v. Gonzalez-Chapel, 849 F.2d 24, 28 (1st Cir. 1988).

Carpenter, 558 U.S. 100, 106 (2009) ("A 'final decisio[n]' is typically one 'by which a district court disassociates itself from a case.'" (alteration in original) (quoting Swint v. Chambers Cty. Comm'n, 514 U.S. 35, 42 (1995)))).[7]  Having concluded that we have jurisdiction over this appeal, we proceed to the merits.

## B.   Motion to Dismiss

The Galvins challenge the district court's dismissal of the counts for declaratory judgment, breach of contract, breach of the covenant of good faith and fair dealing, negligent infliction of emotional distress as to MERS, and intentional infliction of emotional distress as to MERS.  We review these decisions under the usual Rule 12(b)(6) standard.  "Setting aside any statements that are merely conclusory, we construe all factual allegations in the light most favorable to the non-moving party to determine if there exists a plausible claim upon which relief may be granted."  Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 353 (1st Cir. 2013).

---

[7] We do not consider the different question as to whether there was also a judgment set out in a separate document entered on the docket in compliance with Federal Rule of Civil Procedure 58.  Parties can waive that requirement.  See P.R. Aqueduct & Sewer Auth. v. Constructora Lluch, Inc., 169 F.3d 68, 76 (1st Cir. 1999).  Such a waiver occurred here, where the plaintiffs filed the notice of appeal and neither party raised the issue before this court.  See de Jesús-Mangual v. Rodríguez, 383 F.3d 1, 5 (1st Cir. 2004) (finding waiver where district court order "clearly indicated that it intended to dispose of the case finally" and defendant did not object to appeal).

### 1. Declaratory Judgment of Invalid Foreclosure (All Defendants)[8]

On appeal, the Galvins advance two arguments as to why the foreclosure on their property was invalid. First, they argue that U.S. Bank lacked standing to foreclose because it did not own both the note and the mortgage at the time of foreclosure. Second, they argue that U.S. Bank could not exercise the statutory power of sale because it had failed to adhere strictly to the terms of the mortgage, in particular paragraph 22.

Under Massachusetts law, the note and the mortgage are separate legal instruments and, under the common law, they can travel separately. See Eaton v. Fed. Nat'l Mortg. Ass'n, 969 N.E.2d 1118, 1124 (Mass. 2012). However, "where a note has been assigned but there is no written assignment of the mortgage underlying the note . . . the holder of the mortgage holds the mortgage in trust for the purchaser of the note, who has an equitable right to obtain an assignment of the mortgage." U.S. Bank Nat'l Ass'n v. Ibanez, 941 N.E.2d 40, 53-54 (Mass. 2011) (citing Barnes v. Boardman, 21 N.E. 308, 309 (Mass. 1889)).

---

[8] Because of the large number of counts, the variations in the defendants for each count, and the fact that some of the counts were disposed of in part in the ruling on the motion to dismiss and in part in the ruling on the motion for summary judgment, we identify the relevant defendants for each count in a parenthetical included in the section headings.

The note and mortgage may be transferred using different legal mechanisms. The note may be transferred by indorsement and delivery. Eaton, 969 N.E.2d at 1121 n.5. The Massachusetts Appeals Court has applied the provisions of the Uniform Commercial Code ("UCC") to the transfer of a mortgage note. See First Nat'l Bank of Cape Cod v. N. Adams Hoosac Sav. Bank, 391 N.E.2d 689, 693 (Mass. App. Ct. 1979); cf. Eaton, 969 N.E.2d at 1131 n.26 (reserving borrower's argument based on the UCC, but noting that the court "perceive[d] nothing in the UCC inconsistent with [its] view that in order to effect a valid foreclosure, a mortgagee must either hold the note or act on behalf of the note holder"). By contrast, the mortgage is an interest in land, which for our purposes can only be transferred by written assignment. See Mass. Gen. Laws ch. 183, § 3; Ibanez, 941 N.E.2d at 51. Although assignments may be recorded, "[a] valid assignment of a mortgage gives the holder of that mortgage the statutory power to sell after a default regardless whether the assignment has been recorded." Ibanez, 941 N.E.2d at 55.

In this case, as in many others, the mortgage names MERS as the mortgagee "acting solely as a nominee for [the lender] and [the lender's] successors and assigns."

> MERS is mortgagee of record for mortgage loans registered on [its] system, which tracks servicing rights and beneficial ownership interests in those loans . . . . [W]hen the beneficial interest in a loan is sold, the

> note is transferred by indorsement and
> delivery between the parties, and the new
> ownership interest is reflected in the MERS
> system. MERS remains the mortgagee of record
> so long as the note is sold to another MERS
> member; no aspect of such a transaction is
> publicly recorded.

Eaton, 969 N.E.2d at 1121 n.5. Although MERS holds mortgages as a "nominee," MERS has the authority to assign the mortgage without authorization from the holder of the note. Sullivan v. Kondaur Capital Corp., 7 N.E.3d 1113, 1118 (Mass. App. Ct.), rev. denied, 15 N.E.3d 761 (Mass. 2014).

Massachusetts is a nonjudicial foreclosure state, so banks generally foreclose by exercising the statutory power of sale. See Mass. Gen. Laws ch. 183, § 21; Mass. Gen. Laws ch. 244, §§ 11-17C; Pinti v. Emigrant Mortg. Co., 33 N.E.3d 1213, 1221 (Mass. 2015). In order to exercise this statutory power of sale, the bank must satisfy a number of requirements. Two of these requirements are relevant here. First, the foreclosing bank must hold both the note and the mortgage in order to have standing to sell the property at a foreclosure sale. See Eaton, 969 N.E.2d at 1125, 1129-30; Ibanez, 941 N.E.2d at 50 (citing Mass. Gen. Laws ch. 183, § 21; Mass. Gen. Laws ch. 244, § 14). If it does not, the foreclosure is void. See Galiastro v. Mortg. Elec. Registration Sys., Inc., 4 N.E.3d 270, 276 (Mass. 2014); Eaton,

969 N.E.2d at 1131; Ibanez, 941 N.E.2d at 50.[9]  Second, the foreclosing bank must strictly comply with the default notice provisions in paragraph 22 of the mortgage.  Pinti, 33 N.E.3d at 1221 n.16, 1222-24.  Again, failure to do so renders the foreclosure void.  Id. at 1225-26.[10]

When borrowers challenge an entity's standing to foreclose, they often assert defects in the chain of mortgage assignments that ends with that entity.  Under Massachusetts law, the borrowers themselves have standing to press such challenges to the validity of a mortgage assignment when a defect renders the assignment void, but not when it renders the assignment merely voidable by one of the parties to the assignment.  See Bank of

_____

[9] The requirement that the mortgagee also hold the note or act on behalf of the noteholder applies only to foreclosures for which notices of sale were given after the Eaton opinion and to the parties in that case.  969 N.E.2d at 1133.  That ruling was extended to any parties who had raised the issue addressed in Eaton and whose cases were pending on appeal on the date of the decision.  Galiastro, 4 N.E.3d at 277.  The notice of sale in this case was sent on October 20, 2014, so Eaton applies.

[10] By its terms, Pinti only applied to the parties before the court and "mortgage foreclosure sales of properties . . . for which the notice of default required by paragraph 22 [wa]s sent after the date of th[e] opinion[, July 17, 2015]."  Pinti, 33 N.E.3d at 1227.  This rule was later extended to cases in which the issue was preserved and appeal was pending at the time Pinti was decided.  Aurora Loan Servs., LLC v. Murphy, 41 N.E.3d 751, 756 (Mass. App. Ct. 2015).  Murphy contained dicta stating that the rule would not extend "to cases pending in the trial court" at time of Pinti.  Id.  Because we affirm the district court's conclusion that there was no violation of paragraph 22 on the grounds asserted by the Galvins, see infra Section II.B.1.b, we need not decide whether to accept this dicta as a correct statement of Massachusetts law.

- 13 -

N.Y. Mellon Corp. v. Wain, 11 N.E.3d 633, 638 (Mass. App. Ct. 2014); Sullivan, 7 N.E.3d at 1116 & n.7; see also Culhane v. Aurora Loan Servs. of Neb., 708 F.3d 282, 291 (1st Cir. 2013).

### a. Whether U.S. Bank was Holder of the Note and Mortgage

The Galvins argue that they adequately pled that U.S. Bank lacked standing to foreclose because it did not hold both the note and the mortgage at the time of the foreclosure sale. They pled a number of different bases for this argument, but advance just three on appeal: (1) the initial mortgage and all subsequent assignments of the mortgage were invalid because paragraph 20 of the mortgage did not allow it to be held and assigned separately from the note; (2) MERS could not hold the mortgage or assign the interest in the mortgage because doing so violated its internal "Rules of Membership," and therefore the assignment to U.S. Bank was invalid; and (3) U.S. Bank does not hold the note because it was indorsed to "U.S. Bank as Trustee" without specifying the trust. The district court ruled that these allegations could not establish that U.S. Bank lacked standing to foreclose as a matter of law. We agree.

The Galvins' first argument points to paragraph 20 of the mortgage, which states that "[t]he Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower." The Galvins

contend that this language restricted the bank's ability to transfer the note without the mortgage. On two prior occasions, however, we have rejected this reading of materially identical language in similar mortgages. See Mills v. U.S. Bank, NA, 753 F.3d 47, 52 n.1 (1st Cir. 2014); Culhane, 708 F.3d at 292 n.6. This court noted in Culhane that the role paragraph 20 appears to serve is to allow the bank to sell the note without telling the borrower, not to place restrictions on the bank's ability to transfer the note. 708 F.3d at 292 n.6.

Even if we were not bound by this precedent, we would reach the same conclusion. The most the Galvins can show is that this isolated section of paragraph 20 is ambiguous, but whatever ambiguity may exist vanishes when one reads the contract as a whole. As in Mills and Culhane, from the very beginning of this loan, the note and mortgage were held by different parties. The mortgage indicates as much. Under Massachusetts law, contract language is not ambiguous when one of the two possible readings conflicts with other provisions of the contract. See Starr v. Fordham, 648 N.E.2d 1261, 1270 (Mass. 1995) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." (quoting Restatement (Second) of Contracts § 203(a) (Am. Law Inst. 1981))).

- 15 -

The Galvins' second argument--based on MERS's Rules of Membership--fares little better.  The Galvins alleged that MERS violated its internal Rules of Membership by holding and then assigning their mortgage because Chevy Chase Bank, FSB, and the Series 2007-1 Trust are not MERS members.  Therefore, they claim, the assignment of the mortgage to U.S. Bank as Trustee was void.  The district court ruled that a failure by MERS to adhere to its internal Rules of Membership might make the assignment voidable by a MERS member but does not make it void.  Thus, under Wain, the Galvins lack standing to challenge the assignment.  See Wain, 11 N.E.3d at 638 ("[A] mortgagor's standing [i]s limited to claims that a defect in the assignment rendered it void, not merely voidable.")

The district court was correct.  This court has already noted that, under Massachusetts law, a similar type of infirmity makes a contract voidable, not void.  See Wilson v. HSBC Mortg. Servs., Inc., 744 F.3d 1, 10 (1st Cir. 2014) ("[W]hen a corporate officer acts beyond the scope of his authority, 'his acts in excess of his authority, although voidable by the corporation, legally could be ratified and adopted by it.'" (alteration omitted) (quoting Comm'r of Banks v. Tremont Tr. Co., 156 N.E. 7, 15 (Mass. 1927))).  Under Massachusetts law, as long as the assignor is the record holder of the mortgage at the time of the assignment, as MERS was here, an assignment that complies with the statute

governing mortgage assignments, Mass. Gen. Laws ch. 183, § 54B, "cannot be shown to be void." Wain, 11 N.E.3d at 638; see also Wilson, 744 F.3d at 13 ("An assignment binding on the assignor is not, by definition, void."). Although in the district court the Galvins initially challenged whether section 54B had been satisfied, they later abandoned that contention and have not argued it on appeal. Under Wain and Wilson, this proves fatal to their argument that the assignment is void.[11] Because the Galvins' allegations establish, at most, that MERS's assignment of the mortgage was voidable by a MERS member, the Galvins have failed to demonstrate that they have standing to challenge the assignment. See Wain, 11 N.E.3d at 638-39; Sullivan, 7 N.E.3d at 1116 & n.7; see also Culhane, 708 F.3d at 291.

Finally, the Galvins' third argument fails in light of the UCC. They argue that if the original note in U.S. Bank's possession is indorsed to "U.S. Bank as Trustee," then this

---

[11] The Galvins' argument that Wells Fargo Bank, N.A. v. Anderson, 49 N.E.3d 682 (Mass. App. Ct. 2016) implicitly reversed Wain and undercut Wilson relies on a misreading of the opinion. Anderson merely held that section 54B "binds only the entity making and recording the assignment, if such action has been made in compliance with its provisions. The statute does not bind any other party that has standing to contest the validity of the assignment." Id. at 684. This holding is consistent with Wain and Wilson, which held that compliance with section 54B means that an assignment is not void. Those opinions left open the possibility that such an assignment may be voidable by a party with standing. Indeed, later in Anderson, the court stated that very rule and cited Wain approvingly. Id. at 685.

- 17 -

indorsement is insufficient to grant holder status to the foreclosing entity, which is "U.S. Bank as Trustee Relating to Chevy Chase Funding, LLC Mortgage Back Certificates Series 2007-1."  The UCC defines "special indorsement" in a way that includes this indorsement to "U.S. Bank as Trustee" and states that the principles in chapter 106, section 3-110 apply to special indorsements.  See Mass. Gen. Laws ch. 106, § 3-205(a).  Under those principles,

> [t]he person to whom an instrument is initially payable is determined by the intent of the person, whether or not authorized, signing as, or in the name or behalf of, the issuer of the instrument.  The instrument is payable to the person intended by the signer even if that person is identified in the instrument by a name or other identification that is not that of the intended person.

Id. § 3-110(a).  The Galvins have not alleged that the signer of the indorsement, an Assistant Vice President of Chevy Chase Bank, FSB, did not intend to indorse the note to "U.S. Bank as Trustee Relating to Chevy Chase Funding, LLC Mortgage Back Certificates Series 2007-1."  They have thus failed to state a claim that this indorsement was inadequate.

### b. Whether the Default Notice Complied with Paragraph 22

The Galvins also argue that the March 2, 2011, notice of default failed to comply with paragraph 22 of the mortgage, and, therefore, the foreclosure was void.  See Pinti, 33 N.E.3d at 1226.

- 18 -

But see id. at 1227 (applying the newly announced rule prospectively only); Murphy, 41 N.E.3d at 755-56. They alleged in their complaint that the notice failed to comply with paragraph 22 in five ways: (1) it failed to identify the "Lender" or owner of the note; (2) it falsely stated SLS was the "creditor"; (3) it was not from the "Lender"; (4) it stated the total amount due without breaking it down; and (5) the servicer who sent the notice, SLS, did not send the Galvins a breakdown of an alleged $30,000 in fees or other information about the loan upon request.

We consider only the last of these arguments, as it is the only one the Galvins briefed on appeal. This court does not permit parties to incorporate by reference arguments they made in memoranda filed in the district court. See Sleeper Farms v. Agway, Inc., 506 F.3d 98, 104 (1st Cir. 2007) ("[T]his court will only consider arguments made before this court; everything else is deemed forfeited."). This rule that a party appealing a decision must explain to us why the decision is wrong, rather than merely pointing to what it said before the decision was even issued, applies with particular force where one of the arguments the party attempts to incorporate by reference involves an unsettled question of law.[12]

---

[12] The argument that the failure of the note holder itself to send the default notice violates paragraph 22 raises two questions as to which the District of Massachusetts is currently split. First, judges in the district court have reached different

- 19 -

That leaves the Galvins' briefed argument that there was a violation of paragraph 22 because SLS failed, on request, to provide them with "a breakdown of more than $30,000.00 in fees and costs assessed to their loan account as well as proof of who owned their loan."  This argument cannot succeed, since paragraph 22 does not require either the lender or the servicer to respond to such a request.[13]

---

conclusions as to whether a default notice that is not from the note holder violates paragraph 22.  Compare Paiva v. Bank of N.Y. Mellon, 120 F. Supp. 3d 7, 10 (D. Mass. 2015) (holding that the holder of the note must send the default notice to comply with paragraph 22), with Anderson v. Nationstar Mortg., LLC, 172 F. Supp. 3d 371, 376 (D. Mass. 2016) (holding that the assignee of the mortgage may send the default notice under paragraph 22), and HMC Assets, LLC v. Conley, No. 14-10321-MBB, 2016 WL 4443152, at *22 (D. Mass. Aug. 22, 2016) (applying Anderson to default notice sent by servicer).  Second, judges in the district court have reached different conclusions as to whether the Pinti rule may apply retroactively in a situation, like this one, where the borrower raised an argument in the district court about the bank's compliance with paragraph 22 prior to the Supreme Judicial Court's ("SJC's") opinion in Pinti and the property had been sold to the foreclosing entity itself at the foreclosure sale.  Compare Paiva, 120 F. Supp. 3d at 10 (applying Pinti retroactively in this situation), with Carver v. Bank of N.Y. Mellon, No. 13-10005-MLW, 2016 WL 1301053, at *13 & n.15 (D. Mass. Mar. 31, 2016) (applying Pinti prospectively in same situation), and Klevisha v. Provident Funding Assocs. L.P., 167 F. Supp. 3d 250, 254 (D. Mass. 2016) (applying Pinti prospectively in similar situation).

[13] That paragraph reads in relevant part:

> Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify:  (a) the default; (b) the action required to cure the default; (c) a date, not

- 20 -

**2. Breach of Contract (U.S. Bank and MERS)**

The Galvins alleged in their complaint that U.S. Bank and MERS breached the mortgage contract by "failing to comply with the terms [of the MERS mortgage] including but not limited to complying with applicable law (as defined in the mortgage) and the requirements of Paragraph[s] 20 and 22 before defaulting." In the section of their brief addressing the breach of contract claim, they do not offer any additional argument as to how paragraphs 20 and 22 were breached, so this allegation does not succeed for the reasons stated above. The allegation that the defendants failed to comply with "applicable law" does not specify the law with which the defendants allegedly failed to comply or how they failed to comply with it. Such an allegation is too vague and conclusory to state a claim for which relief can be granted. See Freeman v. Town of Hudson, 714 F.3d 29, 35 (1st Cir. 2013) ("In order to survive a motion to dismiss, the complaint must include 'enough detail to provide a defendant with fair notice of what the . . .

---

less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.

- 21 -

claim is and the grounds upon which it rests.'" (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 7 (1st Cir. 2011))).

### 3. Breach of the Covenant of Good Faith and Fair Dealing (U.S. Bank and MERS)

The district court dismissed the count for violation of the covenant of good faith and fair dealing. On appeal, the Galvins argue that the district court treated this claim as premised only on U.S. Bank's failure to consider them for a loan modification, when in fact their complaint listed a number of additional bases, including trespassing, unlawful lockouts, violations of both the mortgage and "applicable law," assessments of unreasonable fees, costs, and expenses, and violations of Chapter 93A. Their brief does not, however, go on to make any developed argument about how these other acts constituted violations of the covenant of good faith and fair dealing. It cites no cases or legal authority and makes no attempt to explain how these other acts would "have the effect of destroying or injuring the[ir] right . . . to receive the fruits of the contract." Weiler v. PortfolioScope, Inc., 12 N.E.3d 354, 361 (Mass. 2014) (citation omitted). This conclusory assertion in the guise of an argument is waived. See Ryan v. Royal Ins. Co. of Am., 916 F.2d 731, 734 (1st Cir. 1990) ("It is settled in this circuit that issues adverted to on appeal in a perfunctory manner,

- 22 -

unaccompanied by some developed argumentation, are deemed to have been abandoned.").

**4. Negligent Infliction of Emotional Distress (All Defendants)**

The Galvins challenge the dismissal of their negligent infliction of emotional distress claim against all defendants. However, they do not argue that the district court erred in dismissing their negligence count or otherwise argue that they pled negligence adequately. Negligence is an element of negligent infliction of emotional distress under Massachusetts law. See Rodriguez v. Cambridge Hous. Auth., 823 N.E.2d 1249, 1253 (Mass. 2005). Thus, the Galvins have abandoned an argument that was essential to maintaining this claim.

**5. Intentional Infliction of Emotional Distress (MERS)**

The Galvins argue that their intentional infliction of emotional distress claim against MERS should not have been dismissed because MERS took "extreme and outrageous" actions by not following its own Rules of Membership when dealing with their mortgage.

> To make out a claim of intentional infliction of emotional distress, the plaintiffs were required to show (1) that [the defendant] intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe.

Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014).  "The standard for making a claim of intentional infliction of emotional distress is very high."  Id. (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996)).  There is no liability even if the defendant acted "with an intent which is tortious or even criminal," with "malice," or with "a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."  Id. (citations omitted).  Not even an "inten[t] to inflict emotional distress" is sufficient.  Id. (citation omitted).  "Conduct qualifies as extreme and outrageous only if it 'go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community.'  A judge may grant a motion to dismiss where the conduct alleged in the complaint does not rise to this level."  Id. at 1128-29 (alterations in original) (citations omitted) (quoting Roman v. Trs. of Tufts Coll., 964 N.E.2d 331, 341 (Mass. 2012)).  On its face, MERS's alleged sloppiness in dotting i's and crossing t's under its own Rules of Membership by allegedly acting as nominee mortgagee for a non-member does not meet this standard as a matter of law.

## C.  Preliminary Injunction

The Galvins argue that the district court abused its discretion in issuing the preliminary injunction.  Their argument, however, is premised in part on a misunderstanding of the effect of that injunction.  They argue at length that the district court

- 24 -

should not have ordered them to transfer any rental payments they had received for their property to U.S. Bank. The docket reveals, though, that the preliminary injunction did no such thing.

Their second argument, that the district court should not have enjoined them from renting out the property in the future, is now moot. The district court granted U.S. Bank's motion for summary judgment as to possession, and the Galvins subsequently agreed to vacate the property. The Galvins do not challenge the grant of summary judgment in favor of U.S. Bank on its possession counterclaim and we have affirmed the dismissal of the declaratory judgment count above. The Galvins do not argue that they have a right to rent out the property in the present circumstances, where they are no longer in possession and the foreclosure sale has not been ruled void. These developments moot this aspect of the appeal. See CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 621 (1st Cir. 1995) ("It has been common ground throughout the last century that an appeal, although live when taken, may be rendered moot by subsequent developments.").

D. **Motion for Summary Judgment**

The Galvins challenge the summary judgment rulings in favor of the defendants on the Galvins' claims for trespass, violation of Chapter 93A, and intentional infliction of emotional distress (as to U.S. Bank and Capital One), and on U.S. Bank's counterclaim for deficiency. As usual, the court reviews these

decisions de novo, drawing all inferences in favor of the Galvins as the non-moving parties.  See Frangos v. Bank of Am., N.A., 826 F.3d 594, 596 (1st Cir. 2016).

   **1.    Trespass (U.S. Bank)**

   The Galvins' complaint alleged that U.S. Bank and its agents trespassed on their property by going onto it multiple times between December 2011 and November 2014, despite the Galvins' request that they not do so, and by locking them out of the property on two occasions when they entered the house and changed the locks. On summary judgment, the district court ruled that the mortgage permitted the bank and its agents to engage in these activities and that therefore they had not committed a trespass.  After considering the summary judgment record, we affirm.

   The mortgage contains two provisions that bear on this dispute.  The relevant portion of paragraph 7 reads:

> Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

The relevant portion of paragraph 9 reads:

> If . . . Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or

- 26 -

assessing the value of the Property, and securing and/or repairing the Property. . . . Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. . . . Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.

The Galvins agree that if these paragraphs permitted U.S. Bank to take the actions it took, then their claim for trespass cannot succeed. They also do not contest that all of the challenged actions occurred after the default on the mortgage, and that therefore the "fail[ure] to perform" condition in paragraph 9 was satisfied. They argue, however, that there is a disputed issue of material fact as to whether U.S. Bank's post-default entries were "reasonable or appropriate," and thus permitted by the mortgage, and that the district court should not have determined that the entries were reasonable as a matter of law. If the entries were not reasonable, they were not permitted by the mortgage, and thus constituted trespass. See New England Box Co. v. C & R Constr. Co., 49 N.E.2d 121, 128 (Mass. 1943) ("To support an action of trespass . . . it is necessary to prove the actual possession of the plaintiff, and an illegal entry by the defendant." (alteration in original) (citation omitted)). A jury might find the inspections unreasonable, say the Galvins, because

- 27 -

of their frequency, the occasional occupancy of the house, the lack of written notice, and the changing of the locks.

We disagree. To begin, inspections occurred less than once per month. The record shows that over the course of thirty-six months between December 2011 and November 2014, twenty-six inspections occurred. Of the twenty-six inspections, twenty-four were drive-by or walk-around inspections, conducted without entering the house.[14] From 2011 through 2013, the Galvins occupied the property only in the late spring through early fall. Ten of the inspections occurred after November 1 and before March 31 in 2011 to 2013 and two occurred during that period of 2014, when the Galvins were unlikely to be home. That leaves fourteen inspections during the remaining twenty-one months in the three-year period.

---

[14] The summary judgment record shows that entries onto the property occurred on the following dates: 12/9/2011, 1/6/2012, 2/4/2012, 2/13/2012, 3/7/2012, 4/12/2012, 5/9/2012, 6/9/2012, 8/10/2012, 9/10/2012, 10/19/2012, 11/14/2012, 11/26/2012, 1/12/2013, 4/23/2013, 5/21/2013, 9/22/2013, 11/26/2013, 12/28/2013, 3/31/2014, 5/7/2014, 6/4/2014, 7/3/2014, 8/2/2014, 9/6/2014, and 11/10/2014. The Galvins do not point to any evidence that any property inspection reports were missing from the summary judgment record. These reports reflect twenty-six entries over the course of three years. Two inspections, on 2/13/2012 and 11/26/2012, apparently involved interior inspections, winterization, and lock changing. There is some doubt as to whether the 2/13/2012 entry in fact occurred, since the report states that the inspection was "NOT COMPLETED." An SLS representative testified at her deposition that the inspection did occur, however. Reading the record in the light most favorable to the Galvins, we assume it did.

Inspections of this frequency were reasonable as a matter of law. The house was a substantial asset, having been purchased for over $2.3 million. It was unoccupied much of the year. During the time the inspections were conducted, the owners had been in default for between two and five years. The Galvins did not present any evidence tending to show that the bank acted unreasonably in performing less-than-monthly exterior inspections in these circumstances. For instance, they offered no evidence to show that this periodic diligence was out of keeping with industry norms or that it was performed in an unreasonable manner.

A reasonable jury also could not find that the Galvins' part-time occupancy, the lack of written notice, or the changing of the locks rendered the inspections unreasonable in these circumstances. The mortgage does not require the mortgagee to rely on the defaulting owners' assertions that the house remains in good condition. Indeed, it explicitly grants the mortgagee additional rights to enter onto the property after a default. The mortgage also imposes no duty on the bank to give written notice of an upcoming inspection. As to the locks, the evidence indicates that the inspectors entered the house and changed the locks on two occasions: on February 13, 2012, and on November 26, 2012, when they entered the house to weatherize it. During the November inspection, the inspectors replaced the lock on the rear door. The record does not indicate which lock the inspectors replaced

during the February inspection, but SLS policy is to replace the lock on the side or back door.  The Galvins offer no evidence that this policy was not followed.[15]  Entering a seasonally occupied house to weatherize it before or during the winter when the owners are not home is unambiguously permitted by paragraph 9, which allowed the bank to "enter[] the Property to make repairs" and "change locks" as part of its broader power to do whatever was "reasonable or appropriate" to protect its interest in the property, including "securing and/or repairing the Property." Making one such entry per winter, the February 2012 entry for the winter of 2011-2012 and the November 2012 entry for the winter of 2012-2013, is reasonable as a matter of law.

The Galvins argue that the assessment of reasonableness is nevertheless always a question for the jury, not a question of law.  Massachusetts law in a closely analogous context is not so absolute.  When a contract does not specify a time for performance, the law implies a contract term providing for performance in a reasonable period of time.  What amount of time is reasonable is often a jury question, but it becomes a question of law at the extremes.  See Flagship Cruises, Ltd. v. New England Merchs. Nat'l Bank of Bos., 569 F.2d 699, 702 (1st Cir. 1978) ("The reasonableness of a period of time--except as to extremes--would

---

[15] The Galvins inaccurately describe the deposition testimony on the subject of this policy in their brief.

seem to be a classic issue for the trier of fact."); Cataldo v. Zuckerman, 482 N.E.2d 849, 857 n.20 (Mass. App. Ct. 1985) (quoting Flagship Cruises); see also Marcus v. Boston Edison Co., 56 N.E.2d 910, 913 (Mass. 1944) ("On undisputed facts what is a reasonable time is a question of law."); Lorenzo-Martinez v. Safety Ins. Co., 790 N.E.2d 692, 696-97 (Mass. App. Ct. 2003) (same); Town of Middleborough v. Middleborough Gas & Elec. Dep't, 715 N.E.2d 467, 470 (Mass. App. Ct. 1999) (same); Plymouth Port, Inc. v. Smith, 530 N.E.2d 194, 196 (Mass. App. Ct. 1988) (imputing a "reasonable time" term into an exclusive brokerage contract and determining that four years was not a reasonable time as a matter of law).

We think that Flagship Cruises states the correct rule in this context as well and conclude that this case falls into the "extremes." Even reading the record in the light most favorable to the Galvins, we conclude that no reasonable jury could deem the inspection activity to exceed the express license granted by the mortgage. Thus, the Galvins' trespass claim fails as a matter of law.

Finally, the Galvins have not cited any authority for the proposition that after the foreclosure sale, when the bank owned the property, its agents could still commit a trespass. The case and statute they do cite are inapposite. See In re Prichard Plaza Assocs. Ltd. P'ship, 84 B.R. 289, 295 (Bankr. D. Mass. 1988) (addressing whether foreclosing bank had the right to collect rents

- 31 -

while out of possession); Mass. Gen. Laws ch. 183, § 26 ("Until default in the performance or observance of the condition of a mortgage of real estate, the mortgagor . . . may hold and enjoy the mortgaged premises . . . ."). This under-developed argument is therefore waived. See Ryan, 916 F.2d at 734.

### 2. Chapter 93A Violation (U.S. Bank)

The district court granted summary judgment on the Galvins' Chapter 93A claim against U.S. Bank because it was derivative of the trespass claim, the grant of summary judgment on which we have affirmed. The Galvins argue on appeal that their Chapter 93A claim also rested independently on the allegation that U.S. Bank assessed unreasonable fees for the inspections, and that the district court failed to address that aspect of the claim.

The Galvins are correct that the portion of their complaint pleading a violation of Chapter 93A incorporated their April 17, 2013 demand letter, which mentioned fees for any "unreasonable inspections" and demanded damages. However, in their opposition to U.S. Bank's motion for summary judgment, the Galvins did not point to any evidence that such fees had been assessed. Likewise, on appeal, the Galvins have not pointed to any evidence demonstrating that there is a disputed issue of material fact as to whether they were charged unreasonable fees

for any inspections.[16]  The documents to which they do point list charges assessed to the Galvins' account on November 20, 2014-- two days after the foreclosure sale.  The amounts of these charges do not match up with the evidence of the cost of the inspections. The Galvins have provided no reason for a jury to believe that these charges were assessed for unreasonable inspections rather than legitimate expenses arising from the foreclosure sale.

By contrast, U.S. Bank has pointed to evidence that it only charged the Galvins' account for a single inspection:  $366 for winterizing the house and changing the lock on the rear door in November 2012.  U.S. Bank has argued that this interior

---

[16] In their brief, the Galvins argue, as they did below, that they were denied discovery on this question and were entitled to know what fees were assessed to their account for the inspections. This contention is not supported by the record.  The Galvins did file an affidavit pursuant to Federal Rule of Civil Procedure 56(d), in response to U.S. Bank's initial motion for summary judgment.  Based on this affidavit, the district court granted summary judgment only as to possession, deferred judgment on the Galvins' remaining claims, and ordered additional discovery.  As part of that discovery, the Galvins deposed an SLS representative, who testified that the Galvins were only charged for one of the inspections.  The Galvins filed a supplemental opposition to the motion for summary judgment incorporating this discovery and did not file an additional affidavit under Rule 56(d).  Thus, they have waived any further challenge to the adequacy of the discovery.  See Kiman v. N.H. Dep't of Corrs., 451 F.3d 274, 282 n.7 (1st Cir. 2006) ("Since [plaintiff] proceeded to oppose summary judgment without filing a Rule 56(f) motion with the district court, he cannot now argue that the district court's ruling was incorrect due to insufficient discovery."); Fed. R. Civ. P. 56 Advisory Committee Notes to the 2010 Amendment ("Subdivision (d) carries forward without substantial change the provisions of former subdivision (f).").

inspection, and the associated fee, was reasonable, but that nevertheless it is not seeking this $366 as part of the deficiency judgment.

The fact that U.S. Bank is not seeking the $366 would not prevent the plaintiffs from recovering under Chapter 93A. See Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 17 N.E.3d 1066, 1077 (Mass. 2014) ("To the extent that a plaintiff already has received compensation for its underlying loss prior to the resolution of its [Chapter 93A] claim, such compensation has been treated as an offset against any damages ultimately awarded, rather than as a bar to recovery."). Therefore, reaching the merits of the claim, we conclude that the single $366 fee charged for inspection and weatherization of the property was not an unreasonable fee as a matter of law, as the inspection itself was reasonable and the assessment of fees for such an inspection is explicitly allowed by paragraph 9 of the mortgage. We need not decide whether it would have been reasonable for the bank to assess more than one such fee in a three-year period. Accordingly, we affirm the grant of summary judgment on the Galvins' Chapter 93A claim.

3. **Intentional Infliction of Emotional Distress (U.S. Bank and Capital One)**

Reading the record in the light most favorable to the Galvins, as a matter of law none of U.S. Bank's activities meet

- 34 -

the high standard for intentional infliction of emotional distress. Entering the house twice to winterize it while the Galvins were not there does not go "beyond all possible bounds of decency," and it is not "regarded as atrocious, and utterly intolerable in a civilized community." Roman, 964 N.E.2d at 341 (citation omitted). Neither is performing an exterior visual inspection of the premises less than once per month. As we have already discussed, the mortgage permitted these activities.

The district court did not separately address the intentional infliction of emotional distress claim against Capital One when it granted summary judgment. However, the Galvins do not argue on appeal that the district court erred in granting summary judgment to Capital One on this count. Thus, they have waived any argument that the district court should not have granted summary judgment in favor of Capital One.

### 4. U.S. Bank's Counterclaim for Deficiency

The district court ruled that the Galvins were obligated to pay the deficiency, and that U.S. Bank had followed Massachusetts law governing notices of intention to foreclose and seek a deficiency, Mass. Gen. Laws ch. 244, § 17B, by sending the Galvins a notice of its intent to foreclose and to seek a deficiency judgment in October 2014. The Galvins argue that U.S. Bank has not shown that it complied with section 17B because that statute also requires that a foreclosing entity sign and swear to

an affidavit confirming the mailing of the notice within thirty days of the foreclosure sale. U.S. Bank argues that it was not required to create this affidavit because the Galvins actually received the notice--or, at least, have not claimed otherwise. We conclude that the plain language of section 17B requires reversal.

This issue turns on a question of statutory interpretation. Section 17B contains both a notice requirement and an affidavit requirement to be satisfied by a foreclosing mortgagee who might wish to receive a deficiency. The notice requirement specifies that a notice of intent to foreclose and a warning in a specified form must be mailed in a particular manner no less than twenty-one days before the foreclosure sale to the person against whom the deficiency will be sought. The affidavit requirement is as follows:

> No action for a deficiency shall be brought . . . by the holder of a mortgage note or other obligation secured by mortgage of real estate after a foreclosure sale by him . . . unless a notice in writing of the mortgagee's intention to foreclose the mortgage has been mailed . . . and an affidavit has been signed and sworn to, within thirty days after the foreclosure sale, of the mailing of such notice. . . . [S]uch an affidavit made within the time specified shall be prima facie evidence in such action of the mailing of such notice.

Id. Although no Massachusetts appellate court has definitively interpreted the affidavit requirement of this statute, the Massachusetts Appeals Court's opinions that have interpreted the

statute's notice requirement have uniformly held that the statute is to be interpreted strictly. See, e.g., Carmel Credit Union v. Bondeson, 772 N.E.2d 1089, 1091 (Mass. App. Ct. 2002) ("Courts interpret a statute in accordance with its plain words. They may not add words to a statute that the Legislature did not put there." (citation omitted)). In rejecting an argument that actual notice is sufficient to satisfy the notice provision of the statute, the Appeals Court has observed that "[t]he statutory language of [section 17B] is more than ordinarily prescriptive," and that "[c]ompliance with the statute is not burdensome," since "[s]ection 17B goes so far as to set out texts of a form of notice and form of affidavit of notice that will satisfy the statute's requirements." Framingham Sav. Bank v. Turk, 664 N.E.2d 472, 474 (Mass. App. Ct. 1996); see also Bead Portfolio, LLC v. Follayttar, 714 N.E.2d 372, 374 (Mass. App. Ct. 1999) (holding that actual notice would not be adequate to comply with § 17B's notice provision since the written notice was sent to the wrong address and substantially deviated from the statutory form); Carmel Credit Union, 772 N.E.2d at 1091–92 (approving Turk and Follayttar). The Appeals Court recently reaffirmed this strict construction of the statute in an unpublished decision. See Bank of New England v. B-P Nantucket LLC, No. 11-P-1141, 966 N.E.2d 868 (Table), 2012 WL 1658354, at *1 (Mass. App. Ct. May 14, 2012) ("The defendants

argue, understandably, that the requirements of [section] 17B are meant to protect mortgagors and are to be strictly construed.").

We see no reason to anticipate that Massachusetts's highest court would interpret the mandatory language of the affidavit requirement any less straightforwardly. U.S. Bank can bring "[n]o action for a deficiency . . . unless . . . an affidavit has been signed and sworn to, within thirty days after the foreclosure sale, of the mailing of [the required] notice." Because U.S. Bank admittedly signed and swore no such affidavit within that time period, its claim for a deficiency must fail.

To avoid this conclusion, U.S. Bank points to a different statute, Mass. Gen. Laws ch. 244, § 15, which governs another affidavit requirement related to the statutory power of sale. In Federal National Mortgage Association v. Hendricks, 977 N.E.2d 552 (Mass. 2012), the SJC relied upon longstanding precedent, see, e.g., O'Meara v. Gleason, 140 N.E. 426, 427 (Mass. 1923); Burns v. Thayer, 115 Mass. 89, 93 (1874); Field v. Gooding, 106 Mass. 310, 312-13 (1871), to state that a deficient section 15 affidavit "does not void a foreclosure sale or the right to possession" and "may be cured by extrinsic evidence that the power of sale was exercised properly and the foreclosure was valid." Hendricks, 977 N.E.2d at 555, 558. Instead, the failure to have a section 15 affidavit merely deprives the foreclosing party of a tool that would be sufficient to prove its prima facie case. Id. at 558-59. U.S.

Bank argues that we should therefore adopt an analogous conclusion (i.e., that the section 17B affidavit is just a tool to make U.S. Bank's proof easier). And there is indeed a district court opinion seemingly accepting such an argument. See Santander Bank, Nat'l Ass'n v. Sturgis, No. 11-10601-DPW, 2013 WL 6046012, at *8-10 (D. Mass. Nov. 13, 2013).

We do not agree that the interpretation of section 15 controls the interpretation of section 17B. Section 15 is itself entirely silent concerning the ramifications of not sending a section 15 notice. At the time of Hendricks, it read:

> The person selling, or the attorney duly authorized by a writing or the legal guardian or conservator of such person, shall, after the sale, cause a copy of the notice and his affidavit, fully and particularly stating his acts, or the acts of his principal or ward, to be recorded in the registry of deeds for the county or district where the land lies . . . .

Mass. Gen. Laws ch. 244, § 15 (2014). The fact that the SJC fashioned a remedy in the face of legislative silence offers no reason to think that it would fashion an analogous remedy in the face of an express legislative mandate that "[n]o action for a deficiency shall be brought." Mass. Gen. Laws ch. 244, § 17B. We conclude, instead, that "[n]o action for a deficiency shall be brought."

### III. Conclusion

For the foregoing reasons, we <u>reverse</u> the entry of judgment in favor of U.S. Bank on its deficiency claim in the amount of $204,535.20.  We otherwise reject the appeal and <u>affirm</u> the challenged rulings of the district court.[17]  Each party shall bear its own costs.

---

[17] U.S. Bank conceded at oral argument that no section 17B affidavit was filed within thirty days after the foreclosure sale. Therefore, on remand the Galvins will be entitled to summary judgment on U.S. Bank's deficiency counterclaim.